George D. Gaw, Appellant, v. The Lake Erie Chemical Company et al., Appellees.

Gen. No. 39,536.

124

Opinion filed December 15, 1937.

V. RUSSELL DONAGHY, of Chicago, for appellant; DAVID A. SCHALLMAN, of Chicago, of counsel.

MILLER, GORHAM, WESCOTT & ADAMS, of Chicago, for appellees; EDWARD R. ADAMS, HERBERT C. DE YOUNG and ROBERT E. ENGLISH, all of Chicago, of counsel.

MR. JUSTICE DENIS E. SULLIVAN delivered the opinion of the court.

This is an appeal from a judgment entered in favor of defendants for costs, based on a verdict by a jury finding defendants not guilty in an action brought by plaintiff to recover for personal injuries sustained as the result of an explosion and the firing of a tear gas pen which was manufactured by one of the defendants and purchased by the plaintiff from the other defendant.

Plaintiff's theory is that the defendants and each of them, represented and warranted to him—both orally and in writing—that certain tear gas fountain pen guns manufactured by the defendant The Lake Erie Chemical Company, a corporation, and sold by it and its agent or salesman, William P. Northcott, the other defendant, were safe and were a positive protection without danger of permanent injury; that he, the

plaintiff, had no previous knowledge concerning said gun or had never had any experience with it, or similar instruments, or with the chemicals therein contained; that he relied upon the representations and warranties made by defendants at the time defendant Northcott solicited him for the sale of said device; that he purchased the said device and that subsequent thereto while placing the loaded tear gas gun in his pocket, it discharged, causing serious injuries to his hand and eyes, which resulted in the amputation of the index finger of his right hand and the partial permanent loss of vision of his left eye; that the representations made by defendants and upon which he relied, were false, untrue and incorrect and he contends that he is entitled to recover from defendants for breach of warranty for the injuries and damages which he sustained.

The defendant, The Lake Erie Chemical Company, made a motion to quash service of summons on the ground that William P. Northcott, upon whom service of summons was had, is not an agent or employee of The Lake Erie Chemical Company in Illinois and that the sale of said pen took place in Cleveland and that said company was not transacting any business and had no agents in Illinois. This motion was continued and later overruled by the court.

Plaintiff further charges negligence on the part of defendants prior to the delivery of the pen or gun to him in that they neglected to exercise due and ordinary care in the manufacturing, assembling and shipping of same, and to test and inspect the said tear gas gun, device or fountain pen, the cartridges, refills, contents thereof and tear gas, so that the said tear gas would be harmless and incapable of causing permanent injury.

The answer of defendant The Lake Erie Chemical Company, admits that it manufactures tear gas guns, but denies that said tear gas guns were dangerous because of their likelihood to explode.

Said answer further denies that William P. Northcott was the duly authorized agent of the defendant, but that Northcott acting as an independent salesman sold a certain tear gas gun to plaintiff; denies that it was its duty, before the sale of the tear gas gun, etc., and delivery thereof to plaintiff, to exercise due care and caution in manufacturing, assembling and shipping the same, to test and inspect the said tear gas gun, etc., as alleged by plaintiff; denies that plaintiff was in the exercise of due care and caution as alleged by him and further denies that the warranties alleged by plaintiff, or any or either of them, were false, incorrect or untrue; that the tear gas gun did permanent injury; that it was not safe to carry and handle and that the gun and tear gas were harmful.

Said answer alleges that defendant has no knowledge or information sufficient to form a belief as to the truth of the allegations wherein the plaintiff states he received, accepted and relied on the warranties and each of them; that the damages in question were not caused by any negligence on the part of this defendant, its agent or servant, but were due to plaintiff's own negligence at or before the time and at the place mentioned in plaintiff's complaint.

Defendant's theory is that they are not liable for the injuries which plaintiff suffered or sustained; and that plaintiff was negligent and careless when he placed the instrument into his pocket.

The evidence tends to show that The Lake Erie Chemical Company was a manufacturer of an appliance known as a "Chemical Warfare Gas Fountain Pen," which resembles the average fountain pen and has a clip on the side to aid in carrying it in the pocket. Instead of being filled with ink, the instrument is filled with a chemical, which when exploded and discharged forms a tear gas which affects a person's eyes and the nasal and air passages and could be used as

a defense against highwaymen or others who might attempt to assail or harm the possessor of such pen.

The evidence further shows that the method of discharging the tear gas or chemical is by means of a cartridge which contains black powder and is discharged by means of a cap containing fulminate of mercury, which ignites the powder which is held in its place in the cartridge by a paper wad which is expelled when the cartridge is discharged, forcing the said tear gas from the pen or gun.

The testimony shows that the injury to plaintiff occurred at a Halloween party in 1932, when the plaintiff and some of his friends attended a costume party or masquerade which was held at the home of one of his friends; that in the early morning hours, after an evening of festivity and some drinking, the plaintiff, who was dressed as a pirate, took the tear gas gun out of his overcoat pocket to show it to some of his friends; that plaintiff in exhibiting this gun to his friends, took out the cartridge and after it had been examined to the satisfaction of those present, plaintiff replaced the cartridge in the gun and returned it to his inside overcoat pocket and whilst putting it into the pocket, in some way, which is not explained, the gun was discharged thereby forcing some of the tear gas into plaintiff's eyes and also injuring the index finger of his right hand; that plaintiff was taken to a hospital where he remained for a period of several months, during which time the injured finger was amputated because of gangrene infection and his eye which had been injured by the tear gas was being treated, which eye injury resulted in almost a complete loss of vision in one eye.

The testimony further shows that at the time defendant Northcott was endeavoring to sell one of the guns to plaintiff, he gave plaintiff a pamphlet, plaintiff's exhibit 1, which pamphlet describes the pen and

explains its uses and was used by the defendant The Lake Erie Chemical Company to advertise the instrument. A picture of the pen appeared on the pamphlet and another picture entitled, "Preventing an Auto Holdup." The first paragraph of the pamphlet reads as follows:

"A Chemical Warfare Gas Fountain Pen discharged in the face of a bandit, thug, or bully, will render him instantly helpless, blinding him with terrible pain in eyes, nose, and throat, yet inflicting no permanent injury.

"The average citizen or peace officer hesitates to take another's life, often hesitating too long and giving all the advantage to the crook. You need not hesitate to defend yourself with this weapon.

"*While the Tear Gas itself can not produce any permanent injury, it must be remembered that otherwise the shell acts just like a blank cartridge and therefore, at extremely short range, might cause powder burns or cut the skin with the paper wad. At shorter ranges than five feet, therefore, it is recommended that the Pen Gun be pointed at upper part of chest rather than directly at the face of target.*" Said pamphlet also bore several testimonial letters and above the name of The Lake Erie Chemical Company, appears the following: "Positive Protection without danger of permanent injury or death to anyone. A wonderful new chemical weapon. . . . "

As to what was said at the time the defendant Northcott sold the pen to the plaintiff Gaw, the stories differ.

Northcott in testifying stated:

"At the time I made the sale to George D. Gaw, I represented to him that the gun was positive protection without danger or permanent injury, or both, to anyone, if properly used. I didn't tell him at the time I had a conference with him with reference to selling the merchandise, that the fountain pen could be dis-

charged in the face of a bandit and would render him instantly harmless, yet inflict no permanent injury.

"At the time I sold him the gun, I knew that it was not dangerous to both life and limb if it was properly used, and that it might be dangerous to both life and limb if it was improperly used. . . .

"The gun has a safety notch on which the fire knob rested. The only way the gun could be fired would be by putting the point at that notch."

Gaw, the plaintiff testified that at the time of the sale Northcott said to him: "Here is something absolutely harmless, . . . don't you think inasmuch as these guests depend upon you for protection, you should have some too . . . he said it was something that would give complete protection, and absolutely no danger."

Further testifying the plaintiff stated that he bought one of these pens or guns and also three cartridges; that on the night of the accident the gun was in his overcoat pocket, and the overcoat was lying on the bannister; that the inside pocket of the coat was exposed; that the coat had only one inside pocket on the right side; that he told one of the guests not to touch what she thought was a fountain pen as there was a shell in it; that he took the shell out and held it in his hand; that he put the shell back into the gun and was putting it into his pocket when it went off; that he could not say which hand he used in putting the gun into his pocket, but being right-handed he presumed he used his right hand; that in putting the gun in his pocket the gun was facing downward toward the floor; that at no time during the evening did he look into the barrel of the gun; that he did not point the gun to anyone's face; that he certainly would not fire a blank cartridge in his face or hand intentionally; that when the gun was dismantled he looked through the barrel.

No evidence was introduced to support the charge of negligence as to manufacture, shipping, testing or inspection of said gun as charged in the complaint.

In the briefs filed there is quite a lengthy discussion as to the facts and as to the law. Plaintiff claims that he relied upon the warranty, which is exemplified by two exhibits heretofore referred to which were introduced in evidence, and the statements of the defendant Northcott. Opposed to this position is plaintiff's statement when testifying, as follows: "I didn't read the pamphlet that was given me by Mr. Northcott at the time he sold me the gun, as he told me practically everything. I only glanced over it." If, as plaintiff says, he did not read the pamphlets or know of their contents at the time the gun was purchased and in his possession, he could not possibly have relied upon the language as set forth in said pamphlets. Plaintiff also stated that what he relied upon were the statements of the salesman Northcott, some of which statements are denied by Northcott, the defendant.

Again the plaintiff states in his testimony, which is in contradiction of statements made by witnesses on his behalf relative to what occurred at the time of the accident: "I cannot recall any occasion I had to either demonstrate or show the gun to anyone in particular prior to this explosion. I don't recall any people requesting me to demonstrate the gun. I was afraid of it. . . . Of course I wouldn't shoot the gun off with my hand over the muzzle. I certainly wouldn't fire a blank cartridge in my face or hand intentionally, I had no occasion to do so. I wouldn't do so even if I knew that there would be no injury, as Mr. Northcott said it would blind one and render him helpless. . . . I did not shoot the gun and did not illustrate it to anyone. It just accidentally went off."

From the evidence before us it is not plain just what negligence or tortious action on the part of the de-

fendant was the proximate cause of the accident, as contended by plaintiff. If the pamphlets were not read by plaintiff and he was afraid, as he states, of the gun, he must have known there was danger lurking therein and this rather supports the statement of Mr. Northcott that there was no danger to the possessor thereof if properly handled.

This takes us to the circumstances surrounding the accident. When plaintiff attended the party, his overcoat was lying on a bannister and the "pen" in the inside pocket of the overcoat was seen by someone at the party who wanted his autograph. He told the person it was not a pen and undertook to demonstrate that it was a "gun." In order to prevent the gun from being discharged he extracted the cartridge and explained why he carried the gun. After the spectators had been told of the contents of the gun and its uses, the plaintiff in preparing to replace the gun in his pocket, put the cartridge back in the gun, and as he put the gun into his pocket the gun discharged resulting in the injuries which are the basis of this suit.

Just what defendants had to do with this accident which occurred at the party, we cannot comprehend. No defect in the gun was shown and it is quite apparent that plaintiff did not rely upon any representations which he claims were made to him by Northcott. Plaintiff knew the gun was dangerous and no explanation is given as to what caused the gun to discharge, other than plaintiff's statement that it was "accidental." If the gun was accidentally discharged, the negligence was plaintiff's as he had control and possession of the gun for, in his testimony, he said: "Something discharged my shell and the wadding went into my hand. I assume that it fired like any other gun, that it would shoot from the direction from which it is fired. . . . I presume my hand was over the muzzle when it was discharged if this wad got in there."

There are many questions raised as to the instructions that were given to the jury and as to the vacation of a judgment rendered by the court on this verdict in November which was vacated the following August. It seems that on November 21, 1935, the verdict of the jury finding the defendant not guilty was rendered and judgment entered on such verdict. Notice of appeal was not filed until October 26, 1936, although sec. 76 of the Civil Practice Act, Ill. Rev. Stat. 1937, ch. 110, § 200; Jones Ill. Stats. Ann. 104.076, provides that "no appeal shall be taken to the Supreme or Appellate Court after the expiration of ninety days."

On August 11, 1936, plaintiff filed a petition asking that an order be entered *nunc pro tunc* as of November 21, 1935, striking from the records of the superior court all reference to a judgment on the verdict on November 21, 1935, and the court entered an order pursuant to the prayer of said petition.

We are also asked to consider the question as to whether or not Northcott was the authorized agent of the defendant The Lake Erie Chemical Company, so that service upon him would be upon an agent and be binding upon the said The Lake Erie Chemical Company and give the court jurisdiction with regard to said corporation. Nothing could be gained in discussing these questions at length, for the reason that we are convinced that the evidence shows plainly that the proximate cause of the injury was the negligence of the plaintiff in the careless manner in which he handled the tear gas gun and we believe the verdict of the jury was correct.

The instructions to the jury fairly instructed them as to the law applicable to the facts and we have been unable to find any errors on the part of the court which would seriously affect plaintiff's rights. The finding of the jury was correct. Had the jury returned a verdict in favor of plaintiff and judgment had been entered thereon, we feel it would be the duty of this court

to have set the same aside as being against the manifest weight of the evidence.

The injuries in this case were very serious and of the kind that would enlist human sympathy. Plaintiff, a man 44 years of age in full possession of all his faculties, suddenly received painful injuries which were accidentally self-inflicted and which deprive him of almost the entire vision of one eye and the loss of the index finger on one hand and caused him much pain and suffering. These injuries prevent the discharge of business duties to a great degree and also prevent his participation in many of the other activities and pleasures of life, but as we have already stated his claim against defendants for damages is not supported by the manifest weight of the evidence.

Therefore, inasmuch as the evidence does not support the contention of plaintiff, nothing would be gained by setting forth and discussing abstract principles of law.

For the reasons herein given the judgment of the superior court is hereby affirmed.

*Judgment affirmed.*

HEBEL, P. J., and HALL, J., concur.